# Supreme Court of Florida

_____

No. SC12-2271
_____

**JAMES DANIEL TURNER,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[May 15, 2014]

PER CURIAM.

James Daniel Turner appeals an order of the circuit court that denied his motion to vacate a conviction of first-degree murder and sentence of death filed pursuant to Florida Rule of Criminal Procedure 3.851. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const.

## FACTS AND BACKGROUND

On November 29, 2007, a jury convicted James Daniel Turner of the first-degree murder of Renee Howard, the attempted first-degree murder of Stacia Raybon, grand theft of a motor vehicle, home invasion robbery, and aggravated assault on a police officer. Turner v. State, 37 So. 3d 212, 217, 219 (Fla. 2010).

The jury recommended the death penalty by a vote of ten to two for the murder of Howard, and the trial court imposed a sentence of death. Id. at 219-20. In the opinion affirming the convictions and sentences, this Court detailed the facts of the murder:

> . . . Turner had been sentenced to jail in Newberry County, South Carolina, for a violation of probation stemming from a felony battery charge. While incarcerated at that location he was primarily assigned to perform various duties at the local sheriff's office and was given special privileges because he was considered trustworthy. . . . Despite being scheduled to be released from the facility at the end of 2005, on September 28, 2005, Turner escaped from the Newberry County Jail in a stolen Newberry County Office Sports Utility Vehicle (SUV). The SUV was discovered by local employees in the parking lot of a business located in St. Johns County, Florida the next day. Local law enforcement officials found Turner's identification card and multiple rocks of crack cocaine in the stolen vehicle.
> On September 30, 2005, two hotel guests saw Turner lurking around the Comfort Inn located in St. Augustine. . . .
> That morning, Renee Howard, her four children ages eighteen, fourteen, two, and ten months, Howard's eight-month-old granddaughter, and Stacia Raybon occupied room 210 of the motel . . . . Raybon testified that early that morning . . . the defendant passed them, "almost pushing [them] off the sidewalk." Shortly thereafter, Howard drove her son to work and daughter to school, taking two of the other three children with her . . . . Howard returned to the motel and Raybon was on the way downstairs to assist Howard in gathering the children when she noticed Turner outside room 210. Howard, Raybon, and the three remaining children returned to the room to prepare to check out of the motel.
> The record reflects that while preparing bottles at the rear of the room for the children, Raybon saw a flash of light hit the mirror as the door of the room suddenly opened. She then saw Turner go toward Howard. Turner appeared to strike Howard in the midsection and then turned and proceeded to attack Raybon. Raybon crouched on the floor in the rear of the room and buried her face in her hands. Turner pulled Raybon up by the arm and stabbed her in the elbow.

Immediately after stabbing Raybon, Turner noticed Howard move back toward the entry door of the room and Turner turned and directed his attention to her for the second time. Turner's movement afforded Raybon time to grab her purse, rush into the bathroom, and lock herself inside.

While in the bathroom, Raybon heard "loud hitting noises" in the room and the children screaming. Raybon then heard water running in the sink, which was located immediately outside the bathroom door. Turner attempted to force his way into the bathroom, and after he failed multiple times, Raybon asked Turner to release one of the children to her. Turner demanded money, and, after searching her purse, Raybon slid $5 and several credit cards under the bathroom door. Turner slid the $5 back under the door to her and told Raybon to keep it. Turner then brought one of the children to the bathroom door and allowed the child to enter . . . . After Raybon pleaded for Turner to leave her and the children alone, Turner ordered Raybon to wait ten minutes before exiting the room . . . . When Raybon finally exited the bathroom, she discovered Howard's motionless body on the floor.

Id. at 215-17.

In sentencing Turner to death, the trial court determined that the State had proven beyond a reasonable doubt the existence of five statutory aggravating circumstances: (1) Turner previously had been convicted of a felony and was under a sentence of imprisonment (moderate weight); (2) Turner was contemporaneously convicted of a felony involving the use or threat of violence (the attempted murder of Stacia Raybon and the aggravated assault on a police officer) (great weight); (3) the murder was committed while Turner was engaged in the commission of, or an attempt to commit, the crime of burglary or robbery, or both (great weight) (this factor was merged with another aggravating factor—that the murder was

committed for pecuniary gain); (4) the murder was especially heinous, atrocious, or cruel (great weight); and (5) the murder was committed in a cold, calculated, and premeditated manner without any pretense of moral or legal justification (CCP) (significant weight). Id. at 220.

The court found the existence of two statutory mitigating circumstances: (1) the murder was committed while Turner was under the influence of an extreme mental or emotional disturbance (moderate weight); and (2) the capacity of Turner to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired (moderate weight). Id. The trial court also found that the following nonstatutory mitigating circumstances had been established:

> (1) Turner's ability to form loving relationships (some weight); (2) Turner's family problems and mental suffering (little weight); (3) Turner's uncles gave him drugs when he was young (some weight); (4) Turner's cognitive development was impaired due to substance abuse (some weight); (5) Turner's chronic alcohol and drug problem (moderate weight); (6) at the time of the murder, Turner was under the influence of crack cocaine (some weight); (7) Turner was a hard worker and skilled carpenter (little weight); (8) prior to escaping, Turner was a good worker in South Carolina (slight weight); and (9) Turner's appropriate courtroom behavior (some weight).

Id.

On direct appeal, Turner presented the following issues: (1) Turner's retrial violated the double jeopardy clauses of the United States and Florida

Constitutions;[1] (2) the trial court erroneously found the existence of the CCP aggravating circumstance; (3) the death sentence is not proportionate; and (4) Florida's death penalty statute violates Ring v. Arizona, 536 U.S. 584 (2002). Id. at 220-29. This Court denied relief on all claims and affirmed the convictions and sentences. Id. at 229. The United States Supreme Court denied certiorari review on October 18, 2010. Turner v. Florida, 131 S. Ct. 426 (2010).

## Postconviction Motion

On October 12, 2011, Turner filed a motion to vacate his conviction and sentence of death pursuant to Florida Rule of Criminal Procedure 3.851. The motion presented ten claims: (1) trial counsel were ineffective during voir dire for failing to ask questions that would reveal jurors who could not give meaningful consideration to mitigating evidence; (2) trial counsel were ineffective for failing to object to improper comments by the prosecution; (3) trial counsel were ineffective for failing to (a) present nonstatutory mitigation in the form of Turner's probable future good conduct in prison, and (b) ensure that a reasonably competent mental health evaluation was conducted; (4) the Rule Regulating the Florida Bar that prohibits interviews of jurors is unconstitutional and denied Turner the adequate assistance of counsel in pursuing postconviction relief; (5) the instruction

---

1. Turner's first trial ended in a mistrial when a juror suffered a seizure during guilt phase deliberations. Turner, 37 So. 3d at 217-18.

to the jury that its role was merely advisory is unconstitutional pursuant to

Caldwell v. Mississippi, 472 U.S. 320 (1985); further, to the extent trial counsel

failed to present this challenge, they were ineffective; (6) Florida's death penalty

statute is unconstitutional because it fails to prevent the arbitrary imposition of the

death penalty and it violates the prohibition against cruel and unusual punishment;

further, to the extent trial counsel failed to present this challenge, they were

ineffective; (7) Florida's death penalty statute is unconstitutional as applied

pursuant to Apprendi v. New Jersey, 530 U.S. 466 (2000), and Ring; (8)

cumulative error; (9) section 945.10, Florida Statutes (2005), is unconstitutional

because it precludes Turner from knowing the identity of his execution team

members; and (10) Turner may be incompetent at the time of execution.

The postconviction court held a Huff[2] hearing, during which counsel for

Turner advised that an evidentiary hearing was sought only on Claim 3. On March

23, 2012, the postconviction court issued an order that granted an evidentiary

hearing on Claim 3, deferred ruling on the cumulative error claim, and summarily

denied the remaining claims.

**Evidentiary Hearing**

During the evidentiary hearing, Turner presented the testimony of trial

counsel James Valerino and Valli Sottile, Jeffrey Turner (Turner's younger

---

2. Huff v. State, 622 So. 2d 982 (Fla. 1993).

brother), Betty McAlister (Turner's aunt), and Dr. Hyman Eisenstein. The State presented the testimony of Dr. Jeffrey Danziger and Dr. Kimberly Brown.[3]

Valerino and Sottile testified that they prepared and presented the guilt and penalty phases together, with Valerino serving as lead counsel. The attorneys testified that in addition to Drs. Drew Edwards and Stephen Bloomfield, who testified during the penalty phase, and Dr. Harry Krop, who testified during the Spencer[4] hearing, they obtained reports of evaluations of Turner by licensed psychologist and clinical neuropsychologist Dr. Susan Young and psychiatrist Dr. Miguel Mandoki. Valerino testified that he and Sottile made a strategic decision not to present Drs. Young and Mandoki as witnesses because the lawyers concluded the testimony of these doctors would have been detrimental to Turner during the penalty phase. Additionally, because of Turner's exposure to drugs and alcohol at a young age, Sottile approached a psychologist who was experienced in the field of adolescent development and asked if he could assist in Turner's defense. Sottile testified that when the psychologist advised that he could not assist, she and Valerino continued to seek experts or "anybody else who might be able to provide helpful information." Finally, an MRI test was performed on

_____

3. Dr. Brown testified with regard to an issue that is not challenged on appeal. Therefore, her testimony is not included in our analysis.

4. Spencer v. State, 615 So. 2d 688 (Fla. 1993).

Turner; however, because the results were normal, Valerino and Sottile decided not to introduce the MRI results during the penalty phase.

Sottile testified that in preparation for the penalty phase, she spoke with many of the witnesses on the telephone and she spoke with others in person. However, she did not travel to South Carolina to meet with members of Turner's family in person. Instead, mitigation specialist Dr. William Scott and an investigator were assigned by the lawyers to travel to and conduct an investigation in person in South Carolina. Both Valerino and Sottile testified that many of the family members either were not cooperative, or became uncooperative. Valerino testified that Dr. Scott spoke with Turner's aunt, Betty McAlister, "on a couple of occasions until it reached a point where, according to Mr. Scott, she would not answer any of his telephone calls." Valerino testified that he and Sottile were unable to determine why there was a lack of cooperation on behalf of many family members, and Turner's mother in particular. Sottile explained that they did not present McAlister as a penalty phase witness because she did not want to testify. Further, with regard to Turner's brother, Jeffrey, Sottile explained that he "was helpful in the sense of trying to give us family names and where they lived. Outside of that, he really did not want to be involved in this case." Valerino corroborated Sottile's testimony, stating that while Jeffrey was willing to help bring family members to Florida for the penalty phase, he did not want to be a

witness for Turner. The attorneys testified that although Jeffrey attended part of the trial, at one point he left the courtroom and was not seen again. Valerino explained that he presented Dr. Scott during the Spencer hearing in an effort to offer the trial court mitigation "as to the dysfunctional nature of Mr. Turner's family, the complete lack of cooperation or the limited cooperation we were getting from his family."

Jeffrey Turner and Betty McAlister testified that when James Turner was growing up, he was impulsive and spent money recklessly as soon as it was received. They also described three separate incidents in which Turner cut his wrists. Jeffrey testified that Turner displayed inappropriate anger during divorces and relationship breakups. Turner also argued with their parents, punched walls and other objects, and engaged in reckless driving; however, Jeffrey testified that this behavior occurred only while Turner was drinking. Jeffrey testified that Turner could not maintain regular employment. He also stated that their mother would beat Turner and another brother with any object that was available, and the beatings would leave welts on his brothers' bodies.

McAlister testified that Turner did poorly in school, but not because he did not try. Rather, he had a short attention span and appeared to have difficulty concentrating and sitting still. McAlister testified that Turner's grandmother suffered from mental illness serious enough to require institutionalization on more

than one occasion. McAlister also stated that she suffers from bipolar disorder, as do her son and her oldest daughter. McAlister described Turner's behavior as "sometimes up, sometimes down." Both McAlister and Jeffrey testified that they were available and willing to testify during Turner's penalty phase, but no one contacted them to do so.

Clinical psychologist Hyman Eisenstein was retained to evaluate Turner for possible mitigation. Dr. Eisenstein conducted multiple tests on Turner and reviewed Turner's school records as well as other background material, including the findings of other experts who had previously evaluated Turner. Additionally, Dr. Eisenstein spoke with Dr. Krop, who testified during the Spencer hearing, and conducted interviews with family members—specifically, Jeffrey Turner, Betty McAlister, brother Michael Turner, mother Ruby Turner, sister Hope Turner, and the daughter of Betty McAlister.

According to Dr. Eisenstein, the testing results were indicative of cognitive brain damage and deficits in the left brain hemisphere because Turner's verbal memory was significantly lower than his visual memory, and his verbal comprehension score was significantly lower than any other score he received on the Wechsler Adult Intelligence Scale. Dr. Eisenstein agreed with the conclusions of penalty phase expert Dr. Bloomfield that Turner suffers from frontal lobe damage, which can affect judgment. According to Dr. Eisenstein, this damage

manifested in Turner's inability to concentrate during school and his academic failure, and it predisposed Turner to use alcohol and drugs. Dr. Eisenstein also concluded that Turner suffers from alcohol and substance dependence, but noted that Turner's dependence is in remission due to his incarceration.

In addition to dependency, Dr. Eisenstein concluded that Turner suffers from Attention Deficit Hyperactivity Disorder (ADHD), which was evidenced by Turner's difficulties in school, his high energy level, and his impulsive behavior. He further concluded that Turner suffers from Bipolar Disorder, relying upon Turner's family history of the disorder, his depression, and his manic-like symptoms. Dr. Eisenstein also explained that many of the symptoms of Borderline Personality Disorder—impulsivity, reckless spending of money, volatile mood swings, self-mutilation, suicidal behavior, and stress-related paranoia—are also exhibited by individuals who suffer from Bipolar Disorder, and that Turner's behavior supports both of these diagnoses. Finally, Dr. Eisenstein stated that while Turner is not delusional or hallucinating, at times he suffers from an "episodic, psychotic disorder" which can emerge when there is a "confluence" of the circumstances previously discussed.

The expert for the State, psychiatrist Jeffrey Danziger, testified that he interviewed Turner and reviewed documents from the trial and postconviction proceedings, including the testimony of Drs. Edwards, Bloomfield, and Krop, and

- 11 -

the report and data of Dr. Eisenstein. He did not speak with any family members, did not review Turner's school records, and did not conduct any tests. Dr. Danziger reached a diagnosis of Polysubstance Dependence—which included Turner's use of alcohol, powder cocaine, methamphetamine, and prescription opiates—that is currently in remission due to Turner's incarceration. Dr. Danziger concluded that Turner suffers from an Adjustment Disorder with Depressed Mood, a diagnosis that does not rise to the level of a major depressive disorder. Dr. Danziger opined that this diagnosis is not surprising because Turner is on death row and concluded that Turner's mood constitutes a "situational unhappiness due to his current predicament."

He disagreed with Dr. Eisenstein's conclusion that Turner suffers from Bipolar Disorder. According to Dr. Danziger, the manic episodes that are a symptom of Bipolar Disorder must be spontaneous, and cannot be due to a medical condition or substances. He concluded that because he was not aware of Turner exhibiting any manic symptoms during his seven years of incarceration and forced sobriety, Turner's mania was the result of intoxication and dependence on stimulants. He also disagreed with Dr. Eisenstein's conclusion that Turner has mental-illness based psychotic features because "[i]t is well-known that if you're on a binge of methamphetamine or a binge of cocaine, you can develop transient

psychotic symptoms."  Where symptoms are substance induced, Dr. Danziger concluded that they are not evidence of a primary mental illness.

Similarly, Dr. Danziger disagreed with Dr. Eisenstein's diagnosis of Borderline Personality Disorder.  Dr. Danziger noted that Turner had been abusing substances from the ages of thirteen to thirty-three.[5]  According to Dr. Danziger, all of Turner's symptoms that support this disorder—suicide attempts, relationship problems, risk-taking, and paranoia—were likely due to the use of substances and, therefore, did not support the diagnosis.  As with the Bipolar Disorder diagnosis, Dr. Danziger noted that since Turner has been incarcerated, there have been no suicide attempts, transient paranoid ideas, or admissions to a psychiatric unit.  Dr. Danziger did not disagree with the findings of prior experts that Turner has frontal lobe deficits that create issues with regard to emotional control, planning, judgment, and reasoning.  Further, Dr. Danziger could not rule out a diagnosis of ADHD, but said that he did not possess data to indicate that the symptoms of poor concentration and impulsivity were present before the age of seven, which is required for such a diagnosis.  However, even if Turner suffers from ADHD, Dr. Danziger concluded that it had "very little to do with what took place September 30th, 2005."

---

5. Turner was thirty-three years old when he murdered Renee Howard.

On October 4, 2012, the postconviction court issued an order that denied Claim 3 of Turner's motion. This appeal follows.

## ANALYSIS

### Ineffective Assistance of Counsel

This Court has described the standard of review for claims of ineffective assistance of counsel during penalty phase proceedings as follows:

> Following the United States Supreme Court's decision in Strickland v. Washington, [466 U.S. 668] (1984), this Court has held that for ineffective assistance of counsel claims to be successful, two requirements must be satisfied:

> > First, the claimant must identify particular acts or omissions of the lawyer that are shown to be outside the broad range of reasonably competent performance under prevailing professional standards. Second, the clear, substantial deficiency shown must further be demonstrated to have so affected the fairness and reliability of the proceeding that confidence in the outcome is undermined. A court considering a claim of ineffectiveness of counsel need not make a specific ruling on the performance component of the test when it is clear that the prejudice component is not satisfied.

> Schoenwetter v. State, 46 So. 3d 535, 546 (Fla. 2010) (quoting Maxwell v. Wainwright, 490 So. 2d 927, 932 (Fla. 1986)).
> To establish the deficiency prong under Strickland, the defendant must prove that counsel's performance was unreasonable under "prevailing professional norms." Morris v. State, 931 So. 2d 821, 828 (Fla. 2006) (quoting Strickland, 466 U.S. at 688). "A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." Strickland, 466 U.S. at 689. The defendant carries the burden to "overcome the

- 14 -

presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.' " Id. (quoting Michel v. Louisiana, 350 U.S. 91, 101 (1955)). "Judicial scrutiny of counsel's performance must be highly deferential." Id. In Occhicone v. State, 768 So. 2d 1037, 1048 (Fla. 2000), this Court held that "strategic decisions do not constitute ineffective assistance of counsel if alternative courses have been considered and rejected and counsel's decision was reasonable under the norms of professional conduct."

> "Penalty phase prejudice under the Strickland standard is measured by whether the error of trial counsel undermines this Court's confidence in the sentence of death when viewed in the context of the penalty phase evidence and the mitigators and aggravators found by the trial court." Stewart v. State, 37 So. 3d 243, 253 (Fla. 2010) (quoting Hurst v. State, 18 So. 3d 975, 1013 (Fla. 2009)).

Hildwin v. State, 84 So. 3d 180, 186-87 (Fla. 2011).

Both prongs of the Strickland test present mixed questions of law and fact. Derrick v. State, 983 So. 2d 443, 456 (Fla. 2008). Accordingly, this Court employs a mixed standard of review: It defers to a postconviction court's factual findings, provided they are supported by competent, substantial evidence, but reviews the legal conclusions of the postconviction court de novo. Id. Finally, this Court has noted:

> The deference that appellate courts afford findings of fact based on competent, substantial evidence is an important principle of appellate review. In many instances, the trial court is in a superior position "to evaluate and weigh the testimony and evidence based upon its observation of the bearing, demeanor, and credibility of the witnesses."

Cox v. State, 966 So. 2d 337, 357-58 (Fla. 2007) (quoting Stephens v. State, 748 So. 2d 1028, 1034 (Fla. 1999)).

In this case, the Court on direct appeal detailed the penalty phase mitigation offered by trial counsel as follows:

Two of Turner's stepdaughters testified that he was a good stepfather. The grandmother of his stepchildren corroborated that he was a good stepfather. Turner's brother testified that the defendant began drinking with his uncles at a very young age and also helped them deal drugs.

The defense presented expert testimony with regard to the effect of crack cocaine use on the brain. An expert testified that Turner entered a drug rehabilitation facility in 1994 and, while undergoing treatment, attempted to commit suicide. During cross-examination, the expert admitted that Turner's cocaine use influenced his actions on the day of the murder, but did not necessarily cause those actions. He further was of the view that at the time of the murder, assuming Turner had gone at least twelve hours without crack cocaine, he would have been either depressed and subdued or anxious and hypervigilant.

Finally, a psychologist testified that although he did not find that Turner suffered from significant brain damage, he found many cognitive defects. He testified that Turner's biggest deficits involved decision making, judgment, planning, and impulse control. On cross-examination, the psychologist conceded that Turner clearly understood that the killing of Renee Howard was wrong.

. . . . At the <u>Spencer</u> hearing, Turner presented two witnesses. A mitigation specialist and a psychotherapist testified that Turner had a history of abandonment by his mother, became substance dependent at a very young age and therefore never had proper cognitive development, and had a low intelligence level. A psychologist expressed the opinion that Turner had frontal lobe impairment, experienced difficulty with performance tests used to measure executive functions, and had an IQ of around 79.

<u>Turner</u>, 37 So. 3d at 219 (footnote omitted).

The postconviction court held that trial counsel were not deficient during the penalty phase and further concluded that they acted reasonably and in accordance

- 16 -

with prevailing professional standards. We agree. The postconviction record reflects that in addition to presenting the testimony of three doctors and one mitigation expert, trial counsel obtained evaluations from two additional doctors and submitted Turner for an MRI. Counsel made a strategic decision not to present this information during the penalty phase or the <u>Spencer</u> hearing because the MRI did not reflect any abnormalities, and they believed the testimony of Drs. Young and Mandoki would hurt Turner's defense rather than help him. Thus, trial counsel obtained input from no fewer than <u>five</u> addiction, mental health, and medical professionals (Drs. Bloomfield, Edwards, Krop, Mandoki, and Young) and one mitigation specialist, Dr. Scott, who travelled to South Carolina to meet with Turner's family, in formulating Turner's mitigation presentation.

In light of the extensive preparation and investigation performed by trial counsel, we hold that their performance during the penalty phase was in no way deficient, but rather was extensive and thorough. While it can be argued that Dr. Eisenstein's report is more favorable to Turner than the testimony that was presented during the penalty phase and <u>Spencer</u> hearing, this Court has repeatedly held that a completely reasonable investigation into mental health mitigation is not rendered unreasonable simply because the defendant has now obtained the testimony of a more favorable mental health expert. <u>See</u> <u>Cox</u>, 966 So. 2d at 362.

Further, with regard to the alleged failure of trial counsel to provide experts with background information from family members to assist in evaluations of Turner, the postconviction court reviewed the conflicting testimony of trial counsel that the family was uncooperative during the penalty phase, and that of Jeffrey Turner and Betty McAlister, who stated that they were available and willing to testify, and credited that of trial counsel, noting "Ms. Sottile and Mr. Valerino never determined why Defendant's family members were unwilling to cooperate, but their unwillingness to cooperate was evident through their actions, or lack thereof, toward counsel and Defendant." (emphasis supplied). This finding of witness credibility is entitled to deference by the Court. Id. at 357-58. Moreover, the record clearly reflects that biological family members were contacted by the defense but, other than the members who testified during the penalty phase,[6] trial counsel were stonewalled in their attempts to obtain mitigation evidence. We conclude that counsels' performance was not deficient because they affirmatively sought these witnesses—to the point that Betty McAlister refused to accept phone calls from the mitigation specialist—but the family was not cooperative.[7]

_____

6. The record on direct appeal reflects that, in addition to Turner's brother Michael, Turner's sister and cousin also testified during the penalty phase.

7. In fact, Valerino testified that when the mitigation specialist attempted to speak with Turner's mother, "she basically answered the door, wouldn't speak to him, closed the door, and that was it, no cooperation." During the Spencer hearing, the specialist described the encounter as follows:

With regard to the prejudice prong of <u>Strickland</u>, the postconviction court concluded that the testimony of Dr. Danziger was clearer and more concise than that of Dr. Eisenstein, and Dr. Eisenstein's diagnoses were undermined by Dr. Danziger's testimony. The postconviction court found that the available information did not warrant the diagnoses of ADHD, Bipolar Disorder, or Borderline Personality Disorder. We conclude that these findings are supported by competent, substantial evidence. Dr. Danziger presented clear, logical testimony that Turner's Bipolar- and Borderline Personality-like symptoms were more likely due to Turner's extensive stimulant abuse than mental illness, and this opinion was supported by the absence of such symptoms during the time that Turner has been incarcerated and in an environment of forced sobriety. Moreover, although Dr. Eisenstein testified that he reviewed Turner's school records, his report contained no indication that Turner exhibited symptoms of ADHD prior to the age of seven, a requirement for diagnosis of this condition, and none of the data reviewed by Dr. Danziger suggested an onset prior to age seven either.

Had trial counsel presented Dr. Eisenstein as an expert during the penalty phase, the State would have undermined his opinions in the same manner as occurred during the evidentiary hearing. Accordingly, there is no reasonable

[T]he mother refused to see me, but I went to the house where she was staying anyway. She appeared out of the kitchen, but quickly went in a back bedroom and shut the door and sent a message that she just didn't want to talk to me, that she was too nervous to be able to do that.

probability that, had Dr. Eisenstein testified during the penalty phase or the

Spencer hearing, the jury would have recommended or the trial court would have

imposed a life sentence, and our confidence in the outcome of the penalty phase

has not been undermined.  Therefore, Turner has not satisfied the second prong of

Strickland.

In light of the foregoing, we hold that Turner's trial counsel were not

ineffective and affirm the postconviction court's denial of relief on this claim.

**Death Penalty Challenges**

The remaining claims presented by Turner involve challenges to the death

penalty in Florida.  Each of these challenges is either waived,[8] procedurally barred,

meritless, or premature.  See, e.g., Jones v. State, 928 So. 2d 1178, 1182 n.5 (Fla.

2006) (holding that a Caldwell claim is procedurally barred if it is not raised on

direct appeal); Rigterink v. State, 66 So. 3d 866, 897 (Fla. 2011) (rejecting

Caldwell challenge to the standard jury instructions on the merits); Miller v. State,

926 So. 2d 1243, 1259-60 (Fla. 2006) (rejecting as both procedurally barred and

---

8.  With regard to one claim, Turner merely alleges that "Florida's death penalty sentencing scheme is unconstitutional as applied in violation of the Fifth, Sixth, Eighth and Fourteenth Amendments of the United States Constitution and corresponding Florida law."  We have previously explained that on appeal, conclusory allegations are insufficient to warrant relief.  Heath v. State, 3 So. 3d 1017, 1029 n.8 (Fla. 2009) ("Heath has waived his cumulative-error claim because his brief includes no argument whatsoever and instead consists of a one-sentence heading in his brief.").  Based upon our precedent, this completely conclusory claim is waived.

without merit claims that (1) Florida's capital statute fails to provide a standard for determining that aggravating circumstances "outweigh" mitigating circumstances, fails to define "sufficient aggravating circumstances," and fails to adequately define the aggravating circumstances; (2) Florida's capital sentencing procedure lacks the independent reweighing of aggravating and mitigating circumstances required by Proffitt v. Florida, 428 U.S. 242 (1976); and (3) the aggravating circumstances have been applied in a vague and inconsistent manner, and juries have received unconstitutionally vague instructions); Kilgore v. State, 55 So. 3d 487, 511-12 (Fla. 2010) (holding that a challenge to the constitutionality of execution methods is procedurally barred if it is not raised on direct appeal); Wyatt v. State, 71 So. 3d 86, 112 (Fla. 2011) (rejecting challenge to constitutionality of execution methods as meritless); Darling v. State, 45 So. 3d 444, 447-48 (Fla. 2010) (rejecting challenge to constitutionality of section 945.10, Florida Statutes (2007), which exempts from public records the identity of an executioner); Israel v. State, 985 So. 2d 510, 521 (Fla. 2008) (holding that a claim that the defendant may be insane at the time of execution is premature where no death warrant has been signed and the defendant has not been found to be incompetent).

## Cumulative Error

Finally, where the individual claims presented by a defendant are held to be procedurally barred or without merit, a claim of cumulative error will fail.

Lukehart v. State, 70 So. 3d 503, 524 (Fla. 2011); see also Israel, 985 So. 2d at 520. Because we have rejected each of Turner's challenges on appeal, he is not entitled to relief based upon a claim of cumulative error.

## CONCLUSION

In light of the foregoing, we affirm the order of the trial court denying postconviction relief.

It is so ordered.

POLSTON, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, LABARGA, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for St. Johns County,
    Wendy Williams Berger, Judge - Case No. 2005-01954-CF

Raheela Ahmed and Maria Christine Perinetti, Assistant Capitol Collateral Regional Counsel – Middle Region, Tampa,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida, and Mitchell David Bishop, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee