# Supreme Court of Florida

_____

No. SC13-2170
_____

**ANDREW RICHARD ALLRED,**
Appellant,

vs.

**STATE OF FLORIDA,**
Appellee.

[January 14, 2016]

PER CURIAM.

In this case, Andrew Richard Allred, a prisoner under sentence of death, appeals an order denying his initial motion for postconviction relief under Florida Rule of Criminal Procedure 3.851 to vacate his first-degree murder convictions and sentences of death for the murders of Michael Ruschak and Tiffany Barwick. This Court has jurisdiction. Art. V, § 3(b)(1), Fla. Const. For the reasons we explain here, we affirm the postconviction court's order entered after the evidentiary hearing denying postconviction relief.

## I. BACKGROUND

### A. Conviction and Sentence

Allred was indicted on October 23, 2007, on the following charges alleged to have occurred on September 24, 2007: (1) first-degree premeditated murder of Michael Ruschak by shooting with a firearm; (2) first-degree premeditated murder of Tiffany Barwick by shooting with a firearm; (3) armed burglary of a dwelling while inflicting great bodily harm or death; (4) aggravated battery with a firearm (victim Eric Roberts) while inflicting great bodily harm or death; and (5) criminal mischief of a motor vehicle (Barwick's car). Then, on April 30, 2008, Allred entered written and oral guilty pleas to all charges. The trial court conducted a plea colloquy of the defendant and accepted the guilty plea . . . .

Allred v. State, 55 So. 3d 1267, 1271 (Fla. 2010). Against advice of counsel, Allred subsequently waived both his right to a penalty phase jury and his right to be present in the penalty phase. The facts of the case and the evidence presented during the penalty phase are more fully described in this Court's opinion on Allred's direct appeal. We briefly review them here.

On August 25, 2007, Allred and his girlfriend Tiffany Barwick publicly and angrily broke up at a party celebrating his twenty-first birthday. Id. at 1272. Several days later, he used pictures of Barwick for target practice and sent Barwick a picture of the bullet-ridden photos. Subsequently, upon learning that Barwick had sexual intercourse with Michael Ruschak, his best friend, Allred sent them both threatening messages, and he told his friend Michael Siler that he needed to start killing some people. Id.

On September 24, the day of the murders, Allred hacked Barwick's computer and engaged in a heated exchange of messages, telling Barwick that he

could not forgive her and threatening to kill Ruschak. Id. at 1273. In a separate exchange, he also told his friend Siler that he would kill both Barwick and Ruschak. Id. at 1272-73. Sitting at home later that evening, Allred called Ruschak and announced that he was coming over. Allred then picked up his gun and drove to Ruschak's location.

At the time, Ruschak was living at his friend Eric Roberts' house, as was Barwick. Four other friends had arrived for dinner that night, when Ruschak informed them that Allred was coming. Allred arrived soon thereafter and repeatedly rammed Barwick's car with his truck. Then, when no one would let him in the front door, he shot out the glass back door and entered the house as everyone fled. Id. at 1273.

After firing a shot down the hallway at Ruschak, Allred walked through the hall to the kitchen and shot Ruschak four times, killing him. Then, Roberts grabbed Allred, and they struggled until Allred shot Roberts in the leg. Allred proceeded to the hall bathroom where he found Barwick standing in the bathtub, frantically talking to a 911 operator. "In his confession, Allred recounted that after he gained his release from Roberts, he entered the bathroom. Then, without saying a word, he fired [six] shots into Barwick. She collapsed in the tub and died." Id. at 1274.

> After leaving the crime scene, [Allred] called 911. He reported that he had killed two people and threatened to commit suicide. When

Deputy Sheriff David Kohn arrived at Allred's home, Allred was standing at the end of his driveway near the road, with a cell phone in his hand and his gun on the ground. Upon initial contact, Allred told the officer, "I'm the guy you're looking for." After the officer secured him, Allred asked "if the people were dead," but the officer told him he could not provide that information. Then, in the patrol car, Allred stated, "I knew I killed someone, I shot fourteen times."

Id. After being turned over to the Oviedo Police Department and being advised of his rights, he again confessed to the murders. Id.

In mitigation, Appellant's mother, father, and grandfather testified regarding Allred's formative years, noting his personality change at a young age, a tic disorder he developed, and his diagnosis of attention deficit hyperactivity disorder (ADHD). Id. 1275. Three of his school teachers testified to his high IQ and abilities in school. Id. at 1276. Allred was sentenced to death for each of the murders.

[T]he court found the following three aggravating factors and ascribed the weight indicated as to Allred's murder of Michael Ruschak: (1) cold, calculated, and premeditated (CCP)—great weight; (2) murder committed while engaged in a burglary—little weight; and (3) prior capital or violent felony conviction (Barwick's contemporaneous murder)—great weight. As to Barwick's murder, the court found the following three aggravators and ascribed the weight indicated: (1) the murder was especially heinous, atrocious, or cruel (HAC)—great weight; (2) CCP—great weight; and (3) prior capital or violent felony conviction (Ruschak's contemporaneous murder)—great weight. The court also considered the following mitigating circumstances and ascribed the weight indicated: (1) defendant accepted responsibility by entering guilty pleas—little weight; (2) defendant cooperated with law enforcement—moderate weight; (3) defendant suffered from an emotional disturbance—moderate weight; (4) defendant's emotional and developmental age was less than his chronological age—not

established; (5) other factors including that defendant was likely sexually abused—not established; and (6) defendant's developmental problems at a young age impacted his educational and social development—little weight.

Id. at 1277 (footnote omitted).

## B. Direct Appeal

On direct appeal, Allred raised the following claims: (1) the CCP aggravator does not apply to either murder; (2) the HAC aggravator does not apply to Barwick's murder because "[her] death from Allred's rapid gunshots was nearly instantaneous and thus the victim's fear of impending death could only have lasted a matter of seconds"; and (3) the trial court erred in considering mitigation by (a) ascribing little weight to Allred's guilty plea and (b) rejecting as mitigation the factors of extreme emotional disturbance, Allred's age at the time of the murders, and the contention "that [Allred] was 'likely' sexually abused as a child." Id. at 1277-83. He also argued that the court erred by failing to consider mitigation that he did not "specifically propose . . . as separate, nonstatutory mitigating factors." Id. at 1282. For the reasons explained in the opinion, we affirmed the trial court's judgment on all issues raised and determined that the guilty pleas were voluntary and the death sentences were proportional. Id. at 1283-84.

## C. Postconviction Proceedings

In 2012 Appellant, through counsel, filed a motion for postconviction relief under Florida Rule of Criminal Procedure 3.851 and amended the motion in 2013.

In the motion, Appellant raised the following claims: Trial counsel provided constitutionally ineffective assistance by (1) failing to ensure Appellant received a reasonably competent mental health evaluation; (2) failing to investigate all circumstances bearing on Appellant's decision to plead guilty and advise Appellant accordingly; (3) causing Appellant to involuntarily waive a penalty phase jury; (4) failing to employ a mitigation expert; and (5) failing to investigate and present mitigation regarding Appellant's ability to adapt to prison life. In addition, Appellant argued that (6) the cumulative errors of counsel deprived him of a fair trial; (7) Florida's capital sentencing statute is unconstitutional on its face and as applied; (8) the Eighth Amendment prohibition of the United States Constitution on cruel and unusual punishment will be violated if he is incompetent at the time of his execution; (9) Florida's lethal injection method constitutes cruel and unusual punishment under the Eighth Amendment; and (10) section 945.10, Florida Statutes, which prohibits Appellant from knowing the identities of his execution team, violates his rights under provisions of the federal and Florida Constitutions. The circuit court denied Appellant's later request to amend his postconviction motion with a claim that counsel was ineffective for failing to ensure the procedures of Koon v. Dugger, 619 So. 2d 246 (Fla. 1993), and Muhammad v. State, 782 So. 2d 343 (Fla. 2001), were followed. The postconviction court pointed out that Appellant failed to show the cases applied in light of defense

counsel having presented mitigation in the case. Moreover, Appellant did not allege that the facts supporting the claim were unknown at the time the postconviction motion was filed.

The trial court held an evidentiary hearing on the first three claims. Trial defense counsel Timothy Caudill and Rebecca Sinclair testified, as did Dr. Deborah Day, Ph.D., clinical director of Psychological Affiliates, who was engaged by defense counsel to conduct mental health interviews and testing of Appellant in preparation for the penalty phase. Dr. Jeffrey Danziger, M.D., a forensic psychologist, who examined Appellant before the penalty phase and found him competent, also offered testimony for the State. Appellant presented the testimony of two clinical psychologists, Dr. Glenn Caddy, Ph.D., who testified Appellant was in a dissociative state at the time of the murders, and Dr. Gary Geffken, Ph.D., who opined that Appellant suffers from an autism spectrum disorder (ASD) but is high functioning. Finally, Dr. Harvey Moore, Ph.D., of Trial Practices, Inc., who advises attorneys on trial issues, such as jury selection and trial strategy, testified for Appellant regarding the considerations involved in making venue decisions and other consulting services his company provides to trial counsel. Subsequently, the circuit judge issued an order denying all claims in Appellant's postconviction motion. Appellant filed the instant appeal.

## II. ANALYSIS

In this case, Appellant raises three claims that trial counsel provided constitutionally ineffective assistance and challenges the constitutionality of several of Florida's death penalty provisions. Specifically, Allred contends as follows. The postconviction court erred in denying his claims that trial counsel provided constitutionally ineffective assistance by (A) failing to obtain a competent mental health evaluation; (B) failing to conduct an adequate investigation and advise him regarding the guilty plea; and (C) failing to move for change of venue and hire a trial consultant. In addition, the postconviction court erred in (D) denying Appellant's contention that cumulative error denied Allred a fair trial. Appellant then contends that (E) Florida's capital sentencing statute is unconstitutional; (F) his execution would violate the Eighth Amendment of the United States Constitution; (G) Florida's lethal injection method is unconstitutional; and (H) the Florida statute that protects the identities of his executioners is unconstitutional. Below, we address each claim in turn.

The claims of ineffective assistance of counsel present mixed questions of law and fact subject to plenary review. Occhicone v. State, 768 So. 2d 1037, 1045 (Fla. 2000). To obtain relief on a claim of ineffective assistance of counsel, the defendant must first identify specific acts or omissions of counsel that are "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." Strickland v. Washington, 466 U.S. 668, 687 (1984).

Then, the defendant must establish prejudice by demonstrating a reasonable probability that, "but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a "probability sufficient to undermine confidence in the outcome." Id. Where, as in this case, the defendant pleaded guilty, however, the second prong of the ineffectiveness test is somewhat altered. Thus, Allred must establish prejudice by demonstrating "a reasonable probability that, but for counsel's errors, he would not have pleaded guilty and would have insisted on going to trial." Hill v. Lockhart, 474 U.S. 52, 59 (1985). "Unless a defendant makes both showings, it cannot be said that the conviction or death sentence resulted from a breakdown in the adversary process that renders the result unreliable." Lynch v. State, 2 So. 3d 47, 57 (Fla. 2008) (quoting Strickland, 466 U.S. at 687). This Court independently reviews the trial court's legal conclusions and defers to the trial court on questions of fact. Below, we address each issue in turn and then conclude that the postconviction court's order denying relief must be affirmed. As explained below, Appellant failed to establish either prong of Strickland as to each claim.

The other claims presented by Appellant are also without merit.

## A. Ineffective Assistance Regarding Mental Health Mitigation

Appellant argues trial counsel provided ineffective assistance by failing to ensure Allred had a reasonably competent mental health evaluation. Specifically,

he contends that trial counsel (1) misinterpreted and unreasonably relied on Dr. Deborah Day's opinion, and (2) failed to adequately investigate Allred's background and to present a mental health expert.

### 1. Reliance on Expert Opinion

Allred contends the postconviction court erred in denying his ineffective assistance of counsel claim, because defense counsel misinterpreted Dr. Deborah Day's diagnosis and unreasonably relied on Dr. Day's expertise as a mental health expert. The evidence presented at the hearing showed that defense counsel Timothy Caudill retained Dr. Day, a forensic clinical psychologist and director of Psychological Affiliates, to evaluate Allred. Caudill had previously employed Dr. Day's services for evaluations of defendants in capital cases and expert mental health testimony. Her practice employs a team approach, with each professional in the practice on a particular client's team participating in the evaluation and the lead expert making the final diagnosis. Dr. Day and two other psychologists, Dr. Robert Janner and Dr. Amanda Janner, interviewed Appellant, obtained and examined Appellant's school and medical records, police and other reports pertaining to the crime, including Allred's text messages, the tape of Allred's police interview, and Barwick's 911 call, and conducted and reviewed psychological testing of Appellant. The testing included the WAIS-III (Wechsler Adult Intelligence Scale), MMPI-2 (Minnesota Multiphasic Personality Inventory,

Second Edition), VIP (Validity Indicator Profile), and an IQ test. As lead, Dr. Day was responsible for any diagnosis in the case.

The evidence presented at the evidentiary hearing showed that as the penalty phase proceeding approached, Attorney Caudill encountered Dr. Day at the jail and inquired whether she had any mitigation to help Allred's case. According to Caudill, she responded that she did not have anything helpful, explaining that if she had to testify to a diagnosis it would be antisocial personality disorder (ASPD) or possibly that Allred is a psychopath or sociopath. Although defense counsel understood that Dr. Day had not made a final diagnosis, he deemed such testimony would be harmful to the case and—after consultation with co-counsel—made the strategic decision not to use the mental health expert's testimony. Co-counsel Sinclair memorialized their tactical decision in a research memorandum that stated in part that Dr. Day had "concluded" that Allred was a psychopath or sociopath.

Dr. Day testified at the postconviction hearing that she never reached a formal diagnosis of Allred. If she had testified at trial, however, she would have opined that Allred's personality evidenced all but one of the elements of ASPD: he lacked a conduct disorder extending from childhood or adolescence into adulthood. In addition, he evidenced traits of sociopathy and psychopathy. Allred was deceptive and had poor impulse control, anger issues, and a history of manipulations and antisocial beliefs, among others. In addition, Allred's MMPI-2

results showed elevated scores on the psychopathic deviate scale. Moreover, Dr. Day reported to Caudill that Allred recounted the murders to her in vivid detail, reflecting cold, calculated, and premeditated acts. And Allred felt justified in the murders and demonstrated a lack of remorse, empathy, and understanding of what Barwick's family was experiencing. For example, while awaiting trial, Allred wrote several letters to Barwick's family. When he learned that they tried to block receipt of his letters, he wrote a letter excoriating them and wishing them lives of misery.

The postconviction court found that trial counsel's memorandum overstated Dr. Day's "conclusion" because Dr. Day never made a formal diagnosis. However, the court deemed trial counsel's reliance on Dr. Day's representations in making the strategic decision not to use her testimony was not unreasonable. She had clearly indicated to Caudill that her testimony would be more aggravating than mitigating. In addition, by not using her expert testimony, Caudill kept out testimony about Allred's lack of empathy or remorse.

As evidenced by the foregoing discussion, Caudill did not misunderstand Dr. Day; she had little in the way of mitigation to help Allred's case. Although testimony of such mental health disorders or traits of disorders, such as ASPD, may be viewed as mitigating in certain circumstances, the mental health factors in this case are generally deemed aggravating. In Looney v. State, 941 So. 2d 1017,

1028 (Fla. 2006), for example, the defendant, like Allred, raised a postconviction claim that counsel was ineffective for failing to present the testimony of a mental health expert during the penalty phase. Defense counsel, like counsel in the instant case, had retained a mental health expert but chose not to have him testify because it would be too prejudicial. The expert's diagnosis was that Looney

> was a psychopath who typically display[ed] social maladjustments or socially unacceptable behavior traits such as lack of remorse, criminal behavior, superficial charm, grandiose sense of self worth, the need for stimulation, pathological lying, manipulativeness, shallow emotions, difficulty with lasting relationships, impulsivity, poor behavior control, lack of empathy, etc.

Id. In Looney, this Court recognized the prior approval of such a strategic decision and reiterated that "a diagnosis as a psychopath is a mental health factor viewed negatively by jurors and is not really considered mitigation." Id. at 1028-29. Accordingly, we held that "defense counsel [was] not ineffective for deciding not to seek an additional mental health evaluation after receiving an extremely unfavorable evaluation." Id. at 1029. See Floyd v. State, 18 So. 3d 432, 453-54 (Fla. 2009) (holding defense counsel made a strategic—not a deficient—decision not to present doctor's ASPD diagnosis of defendant because evidence was harmful, not mitigating).

In this case, Appellant's trial counsel was not deficient for choosing not to present Dr. Day's testimony. Although she did not reach the ASPD diagnosis, her testimony that Allred met all but one of the factors essential to the diagnosis would

- 13 -

not have been mitigating in nature.  Neither would her testimony that he had some of the traits of a sociopath and a psychopath.  As the postconviction court found, Dr. Day is a well-qualified expert who has testified in other death penalty proceedings, and trial counsel's reliance on her professional assessment—albeit not a formal diagnosis—was not unreasonable.  Accordingly, we affirm the postconviction court's determination that trial counsel's decision not to use a mental health professional was strategic in nature, not evidence of deficient performance.

### 2. **Background Investigation and Expert Mental Health Witness**

Appellant next argues that counsel was ineffective for failing to conduct a sufficient background investigation and to present a mental health expert in the penalty phase.  We disagree.  First, as recounted in the opinion affirming Appellant's conviction and sentence, trial counsel conducted a background investigation.  Defense counsel interviewed and presented a number of witnesses in mitigation during the penalty phase, including Appellant's mother, father, paternal grandfather, and three of Allred's teachers (one each from elementary, middle, and high school).  The defense also obtained school, medical, and police records.  Allred, 55 So. 3d at 1275-77.  The defense presented evidence in the penalty phase showing that Allred has a high IQ and left school after eleventh grade, but obtained his high school diploma at a community college and earned a

two-year degree in accounting at another. Until the day of the murders, "[h]e was employed full time teaching the use of software, and he paid for his own car and cell phone." Id. at 1275. In his youth, however, Allred was diagnosed by a psychiatrist as having a "tic disorder" that he subsequently outgrew and ADHD. In addition, he had difficulty with social relationships and witnessed an instance of his father's domestic violence on his mother. The evidence also showed that defense counsel investigated the possible sexual abuse of Appellant by his grandfather. Counsel, however, was unable to obtain any supporting testimony, and Appellant denied such abuse occurred and specifically forbade presentation of any such testimony.

Defense counsel's decision not to present Dr. Day's mental health testimony did not require the continued search for a more favorable mental health opinion. See Anderson v. State, 18 So. 3d 501, 511-12 (Fla. 2009) ("The fact that [the defendant] has subsequently found experts whose opinions conflict with [the mental health expert's] opinion does not render the earlier evaluation inadequate."); Sexton v. State, 997 So. 2d 1073, 1085 (Fla. 2008) (stating subsequent finding of an expert who disagrees with "the extent or type of testing performed, or the type of mitigation presented, does not mean that trial counsel was deficient at trial"). Nevertheless, Appellant urges that counsel should have

- 15 -

gone expert shopping, citing the opinions of Dr. Caddy and Dr. Geffken offered at the postconviction evidentiary hearing.

Dr. Caddy concluded, based on Appellant's fragmented memory of the events some years after the murders, that during the crimes Appellant was in a dissociative state and thus lacked a rational understanding of the consequences of his actions at that time. Dr. Geffken, on the other hand, testified that Allred suffered from an autism spectrum disorder but was high functioning. He stated that Allred had a high IQ but lacked empathy and sympathy and was unable to cope with the breakup from Barwick. Dr. Geffken admitted, however, that Appellant's actions in the murders were deliberate, albeit atypical of someone with such a disorder, and that Allred felt no remorse.

The postconviction court rejected both experts' diagnoses as not credible based largely on the testimony of Dr. Jeffrey Danziger, who previously examined Appellant as to the viability of an insanity defense and found Appellant competent. Danziger again examined Appellant before the postconviction hearing as the State's mental health expert. Dr. Danziger testified that, contrary to Dr. Caddy's testimony, the evidence showed that Allred was aware of his actions during the murders. He explained that Appellant threatened to kill the victims, including on the day of the murders; warned Ruschak prior to his arrival; and when he arrived, searched out and killed them. Dr. Danziger also disputed Dr. Geffken's diagnosis

of autism spectrum disorder, noting the individual must have restrictive or repetitive patterns of behavior, and Dr. Geffken acknowledged that Appellant had none.

In light of the foregoing, we affirm the postconviction court's rejection of Appellant's claim that trial counsel provided ineffective assistance of counsel regarding the presentation of mental health evidence in the penalty phase. As the circuit court found, the evidence presented established neither that Appellant was in a dissociative state nor that he suffered from an autism spectrum disorder. Moreover, securing a more favorable expert opinion does not undermine the sufficiency of the original expert's opinion. See Floyd, 18 So. 3d at 453 ("[W]here counsel did conduct a reasonable investigation of mental health mitigation prior to trial and then made a strategic decision not to present this information, we have affirmed the trial court's findings that counsel's performance was not deficient.") Accordingly, Appellant has demonstrated neither deficiency nor prejudice.

**B. Ineffective Assistance Regarding the Guilty Plea**

Appellant argues that the trial court erred in denying his claim that counsel was ineffective for failing to conduct an adequate investigation and advise him regarding his guilty plea. Specifically, he claims counsel failed to develop a relationship of trust with Appellant and failed to present evidence that Appellant was unable to form the requisite premeditation for first-degree murder or the

heightened premeditation required for the CCP aggravator. The postconviction court denied the claim, determining that Allred failed to demonstrate a reasonable probability that he would not have pleaded guilty but for counsel's errors. See Hill, 474 U.S. at 58-59. We affirm the postconviction court's decision.

Appellant did not testify at the evidentiary hearing, and as the postconviction court found, no evidence was offered to support his claims. Regarding the first claim, the testimony that was presented by various witnesses shows that Caudill or one of his associates regularly met with Appellant. Caudill discussed the process and plans with Appellant, cautiously determining what Appellant would and would not allow. Appellant, however, never wavered in his desire to waive trial and plead guilty, despite counsel's efforts to persuade him otherwise. In fact, the record shows that Appellant's decisions were made against the advice of counsel and there was nothing counsel could have done to change Appellant's mind.

Regarding the second contention that counsel did not investigate evidence of Appellant's mental status to negate the element of premeditation, the evidence is to the contrary. Defense counsel had Appellant evaluated for competency and for mitigation. Dr. Danziger found Appellant competent, and although Dr. Day did not reach a diagnosis, she found that Appellant did not lack the ability to form the requisite intent for the murders and that she could not provide any mitigation. Appellant's claim that he lacked the heightened intent is based on his own self-

serving statement to police at the time of his arrest that he went to the house that evening only to bash Barwick's car. Allred, 55 So. 3d at 1274-75. The evidence shows that Appellant threatened to kill the victims earlier on the day of the murders. Id. at 1278. Then, knowing Ruschak and Barwick would be at a friend's house, he contacted Ruschak and announced that he was coming over. Taking his loaded gun, he went out to his truck. As previously stated, when he arrived, he smashed Barwick's car, but he did not leave. Without provocation from anyone in the house, he picked up his gun, went to the front door, and demanded entry. Failing that, he went to the back of the house and fired his gun into the glass door, shattering it. He went directly to the kitchen and fired four shots into Ruschak's chest, killing him, and then to the bathroom where he fired six bullets into Barwick's body, killing her. Id. at 1280. Allred shot at only one other person in the house. He fired one bullet into the leg of someone attempting to stop him from killing Ruschak. After leaving the house, Appellant called and surrendered to the police, stating that he had killed two people. Id. at 1274.

Appellant's contention that counsel should have presented evidence rebutting both premeditation and CCP is unsupported by any evidence. Moreover, Appellant's self-serving, after-the-fact claim that he did not have a premeditated design does not negate the clear evidence of premeditated murder. We have previously affirmed Appellant's guilty pleas to the charges of first-degree,

- 19 -

premeditated murder and the finding of the CCP aggravator as to each murder. Id. at 1277-79. Accordingly, we affirm the postconviction court's denial of this claim.

### C. Ineffective Assistance Regarding Venue, Mitigation Investigation, and Jury Selection

In his postconviction motion, Allred alleged that his waiver of a jury in the penalty phase was involuntary because trial counsel provided ineffective assistance by (1) failing to move for a change of venue and (2) failing to hire an advisor regarding the mitigation investigation and jury selection. The postconviction court denied the claim, finding no evidence supported Appellant's contention that he would not have waived the penalty phase jury but for counsel's alleged ineffectiveness. Below, we address each claim in turn.

### 1. Venue

First, as we have previously noted, the determination whether to seek a change of venue "is usually considered a matter of trial strategy . . . and therefore not generally an issue to be second-guessed on collateral review." Rolling v. State, 825 So. 2d 293, 298 (Fla. 2002). To meet the first prong of Strickland on an ineffectiveness claim regarding venue, the defendant must establish that grounds for a change of venue existed. To establish prejudice on such a claim—the second prong—the defendant must produce evidence "demonstrating that there is a reasonable probability that the trial court would have, or at least should have, granted" a change of venue motion. Id. at 303 (quoting Wike v. State, 813 So. 2d

12, 18 (Fla. 2002)). A change of venue should be granted where a community "is so infected by knowledge of the incident and accompanying prejudice, bias, and pre-conceived opinions that jurors could not possibly put these matters out of their minds and try the case solely on the evidence presented in the courtroom." Chandler v. State, 848 So. 2d 1031, 1036 (Fla. 2003) (quoting Rolling v. State, 695 So. 2d 278, 284 (Fla. 1997)).

The postconviction court in this case was correct to deny Appellant's venue claim because Appellant failed to present any evidence as to either prong of the Strickland test for ineffective assistance. Dr. Moore, Allred's professional trial consultant in the postconviction proceedings, testified at the evidentiary hearing that articles about the murders appeared in the local press, but he did not discuss either their nature or their effect on the community and provided no recommendation regarding change of venue in this case. As the postconviction court found, Dr. Moore testified to the services he could have offered had he been hired as a consultant. Moreover, at the evidentiary hearing, defense counsel Caudill cited several reasons that there was no concern regarding venue. First, although there had been some publicity about the murders, the defense attorneys in their professional judgment thought it insufficient to warrant a change of venue. Caudill had confidence in the trial judge, whom he knew to be experienced in death penalty proceedings and well-respected in that area of law. Finally, although

- 21 -

defense counsel wanted to seat a jury for the penalty phase in hopes of garnering a life recommendation or some votes for life, Appellant did not agree. Having pleaded guilty against advice of counsel, Appellant wanted to waive the penalty phase entirely. Counsel, however, explained that such a proceeding was required for the trial court to determine the penalty. Nevertheless, against the advice of counsel, Allred waived having a jury in the penalty phase. Accordingly, we affirm the postconviction court's denial of Appellant's ineffective assistance of counsel claim regarding venue.

### 2. Failure to Hire a Trial Consultant

Finally, Appellant argues that counsel was ineffective for failing to engage a trial consultant, like Dr. Moore, to advise defense counsel on voir dire, aid in researching mitigation, and assist his attorneys in developing trial strategy. The postconviction court did not err in denying this claim.

Caudill, lead trial counsel, testified that he was an experienced criminal trial attorney who had previously represented a number of clients in death cases. Thus, he had experience in developing questions for voir dire, researching mitigation, determining whether to seek a change of venue, and developing trial strategy—all aspects of being a trial lawyer. As explained above, there was no trial for which to prepare because Appellant pleaded guilty against advice of counsel; there was no jury in the penalty phase because of Appellant's jury waiver against advice of

counsel; and there was no basis for or need to request a change of venue. As for the mitigation investigation, defense counsel hired an investigator to conduct a search of Appellant's background and retained Dr. Day to conduct the mental health examination. In addition, Caudill and co-counsel conducted interviews of Appellant, his teachers, family, and others and obtained records and other materials regarding Allred's family, school, and medical history.

Dr. Moore, on the other hand, did not testify as to any aspect of this case that would require his assistance. He suggested only that the development of evidence in mitigation that Appellant was sexually abused would have been helpful. However, Caudill's team obtained evidence of a troubled childhood and on its own initiative investigated the possible sexual abuse of Allred by a relative. Appellant, however, denied such abuse occurred and disallowed any evidence suggesting that it took place. Accordingly, Appellant failed to demonstrate that defense counsel was deficient for not having hired a trial consultant.

### D. Cumulative Error

Appellant contends that the cumulative effect of errors of counsel discussed above regarding his guilty plea and the penalty phase denied him the fundamental rights guaranteed him by the United States Constitution under the Sixth, Eighth, and Fourteenth Amendments. Because Appellant has demonstrated neither

deficiency nor prejudice as to any of his claims, the claim of cumulative error fails.

Accordingly, we affirm the denial of relief on this claim.

### E.  Unconstitutional Capital Sentencing Statute

Appellant next argues in conclusory fashion that Florida's capital sentencing statute, section 921.141, Florida Statutes, is unconstitutional on its face and as applied.  We have previously addressed the question of the statute's constitutionality on a number of occasions and upheld its constitutionality.  Lowe v. State, 2 So. 3d 21, 46 (Fla. 2008) (citing prior cases).  Accordingly, we affirm the circuit court's order denying relief on this claim.

### F.  Incompetency at Execution

Appellant concedes that the circuit court correctly denied as premature the claim that his execution would violate the Eighth Amendment if he is not competent at that time.  See Hall v. Moore, 792 So. 2d 447, 450 (Fla. 2001) (agreeing Hall's Eighth Amendment claim that he may be incompetent at the time of execution was "premature" and that Hall conceded "that he cannot legally raise the issue of his competency to be executed until after a death warrant is issued").  Accordingly, we affirm the postconviction court's denial of this claim.

### G.  Constitutionality of Lethal Injection

Appellant claims that Florida's current lethal injection method of execution constitutes cruel and unusual punishment and its use would deprive him of his

constitutional rights of due process and equal protection in violation of the Eighth and Fourteenth Amendments to the United States Constitution and corresponding sections of the Florida Constitution. Specifically, he contends that Florida's present lethal injection procedures create an unconstitutional risk of unnecessary and wanton infliction of pain and cites as evidence the 2006 execution of Angel Diaz. Allred's mere reference to the Diaz execution in contesting the present protocol for execution by lethal injection, however, does not satisfy his "heavy burden" to show "a substantial risk of serious harm, an objectively intolerable risk of harm that prevents prison officials from pleading that they were subjectively blameless for purposes of the Eighth Amendment." Howell v. State, 133 So. 3d 511, 517 (Fla.) (quoting Pardo v. State, 108 So. 3d 558, 562 (Fla. 2012)), cert. denied, 134 S. Ct. 1276 (2014). See Butler v. State, 100 So. 3d 638, 670-71 (Fla. 2012) ("Here, [the Appellant's] only factual basis for challenging Florida lethal injection protocol—the execution of Angel Diaz—has previously been considered and rejected by this Court."). This Court previously has rejected similar challenges to Florida's lethal injection protocol. See, e.g., Chavez v. State, 132 So. 3d 826 (Fla.) (rejecting Eighth Amendment challenge to lethal injection drug protocol as "completely speculative"), cert. denied, 134 S. Ct. 1156 (2014); Muhammad v. State, 132 So. 3d 176, 197 (Fla. 2013) (denying relief because appellant failed to establish use of current three-drug lethal injection protocol risked violating the

- 25 -

Eighth Amendment).  Accordingly, we affirm the postconviction court's denial of relief on this claim.

## H.  Execution Team Prohibition

Appellant contends that section 945.10, Florida Statutes, which prevents a defendant from knowing the identities of his executioners, is unconstitutional.  We have previously found this claim and similar challenges to this statutory provision to be meritless.  Darling v. State, 45 So. 3d 444, 448 (Fla. 2010) ("[T]his Court has consistently rejected similar claims on the merits."); accord Turner v. State, 143 So. 3d 408, 419 (Fla. 2014).  Moreover, as this Court pointed out in Darling, "as of this date the Governor has not signed a death warrant for [Allred]; thus, even if ordered to do so, the Department of Corrections could not state with any certainty who [Allred's] eventual executioners will be."  45 So. 3d at 448.  Accordingly, we affirm the denial of this claim.

## III.  CONCLUSION

Having considered the issues raised by Appellant in this appeal from the denial of Appellant's motion for postconviction relief, we affirm the postconviction court's order for the reasons explained above.

It is so ordered.

LABARGA, C.J., and PARIENTE, LEWIS, QUINCE, CANADY, POLSTON, and PERRY, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION, AND IF FILED, DETERMINED.

An Appeal from the Circuit Court in and for Seminole County,
    Jessica J. Recksiedler, Judge - Case No. 592007CF004890A000XX

James Vincent Viggiano, Jr., Capital Collateral Regional Counsel, Middle Region, Mark S. Gruber, Capital Collateral Regional Counsel, Middle Region, and Julie A. Morley, Capital Collateral Regional Counsel, Middle Region, Tampa, Florida,

    for Appellant

Pamela Jo Bondi, Attorney General, Tallahassee, Florida; Mitchell David Bishop, Assistant Attorney General, and Stacey E. Kircher, Assistant Attorney General, Daytona Beach, Florida,

    for Appellee